## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| Beattie B. Ashmore, as Receiver for the FIP Receivership Entities,<br><br>        Plaintiff,<br>v.<br><br>Morris, Manning & Martin, LLP,<br><br>        Defendant. | Case No. 6:23-cv-04592-BHH<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Beattie B. Ashmore, as Receiver for the FIP Receivership Entities, (the "**Receiver**") brings this Amended Complaint for legal malpractice and breach of fiduciary duty, and alleges as follows:

### NATURE OF THE ACTION

*"I accept this as fact ONLY because of my faith and trust in Jim Maxson."*

Scott Kohn, founder and President of Future Income Payments, LLC

1.      Future Income Payments, LLC (f/k/a Pensions, Annuities, and Settlements, LLC) ("**FIP**") was a growing company that offered lump-sum payments to pensioners in exchange for future pension payments at triple digit interest rates. Nonetheless, seeking to further accelerate its growth, FIP considered changing its business model to instead connect pensioners with investors who would acquire those future pension payments, with FIP receiving fees for servicing and administrating those transactions. In connection with that proposal, FIP retained James Maxson, then a partner at the Atlanta-based law firm Morris, Manning & Martin, LLP ("**Morris Manning**"), to, among other things, evaluate and opine on FIP's proposed structure to identify any issues the changes might create.

2.      Despite securing an initial budget of $10,000-$15,000 to perform what Maxson promised would be a "thorough" analysis, Maxson delivered a perfunctory memo on Morris Manning letterhead presenting "our" conclusion that "it is unlikely" a court would deem the investment transactions to be "investment contracts" that would require registration or exemption under the federal securities laws.

3.      But Maxson failed to identify the fundamental flaws in FIP's structure. Regulators or courts could easily determine that FIP's purported purchases of pensions, described as cash advances, were really disguised loans and that, as loans, they violated state usury and consumer protection laws. If that occurred, the flow of proceeds from the recipients would be reduced as courts or settlements with regulators reformed the agreements to comply with usury laws, significantly increasing the risk to investors and, as a result, to FIP. Therefore, the risk of such an eventuality needed to be disclosed to marketing materials and contracts with investors. By failing to disclose this danger to investors, FIP risked further liability under securities laws. Maxson and Morris Manning should have advised FIP that the proposed change to FIP's business model was unjustifiably risky given that its existing business already faced regulatory scrutiny, that FIP would likely face more as it expanded, and that FIP needed to ensure its compliance with both usury and securities law to survive.

4.      Maxson and Morris Manning knew that those risks were particularly acute because, among other things, FIP's founder and President Scott Kohn was a convicted felon. Maxson and Morris Manning understood from the outset of the engagement that Kohn's criminal background created "some additional level of risk" because, in Maxson's words, "regulators tend to assume that once a crook, always a crook." Maxson testified at his deposition that prior to Morris Manning agreeing to represent FIP, Maxson approached Morris Manning's general counsel about Kohn's

criminal background. Maxson testified that although he could not "disclose what those conversations were," "[l]ong story short, we ended up representing FIP."

5.    Maxson and Morris Manning also chose to represent FIP despite a substantial conflict of interest: Maxson and Morris Manning were also representing various entities controlled by Benjamin Geber (collectively, "**Bally**"). Under FIP's newly proposed structure, Bally stood to cash in because Bally made commissions as a broker or a "consultant" soliciting investors in FIP's new business model. In the short term, as Bally's and FIP's counsel, Morris Manning stood to benefit by minimizing FIP's awareness of the risks of its new structure, enabling Bally to continue earning commissions, and keeping both FIP and Bally as clients. In the long term, the conflict posed a substantial danger to FIP: by underplaying the risk of the new structure and allowing FIP's aggressive marketing, coupled with omissive disclosures, to proceed, Morris Manning put its interests and Bally's interests ahead of FIP's interest in remaining in compliance with the law and solvent enough to honor its obligations.

6.    Despite these red flags and ethical conflicts, Maxson quickly focused on expanding his role with FIP, with Kohn ultimately placing significant "faith and trust" in Maxson. As FIP's outside general counsel from 2012 through its collapse in 2018, Maxson became involved in nearly every aspect of FIP's business from a legal perspective.

7.    In that capacity, Maxson drafted FIP's legal documents, and reviewed and revised company marketing materials. The legal agreements Maxson drafted and the marketing materials he reviewed, edited, and approved were used to secure investors, but entirely failed to disclose Kohn's criminal background or the regulatory risk FIP faced and its carry-on impact on FIP's ability to meet commitments to investors if pension payments were halted because of regulatory sanctions.

8.      Had FIP's legal agreements and marketing materials adequately disclosed those risks to investors, FIP would have ensured its compliance with securities laws. Instead, Maxson's deficient and conflicted legal advice propelled FIP toward numerous enforcement actions by state agencies and attorneys general and, eventually, company-destroying liability for mail, wire, and securities fraud. Maxson apparently did not discover his error until October 2014 when FIP began to enter into settlement negotiations with state regulators

9.      As Maxson had foreseen in 2014, to satisfy the expectations of unsuspecting investors and prevent the entire enterprise from collapsing once state regulators began issuing determinations that FIP's cash advances were disguised loans, FIP passed a point of no return and could not bring itself into compliance with applicable laws, while using new investor money to make payments to old investors as though those amounts came from pensions or the reserve account.

10.     Ultimately, Morris Manning's and Maxson's negligent advice was critical to FIP's transition from a salvageable business into unsavable and unlawful monstrosity. In fact, had Morris Manning and Maxson provided competent and unconflicted advice to FIP, FIP could have pulled itself back and returned to compliance with applicable laws. Although Maxson departed Morris Manning in January 2015, Maxson continued representing FIP until it ceased operations in April 2018, by which point investors victimized by the scheme Maxson had helped create at Morris Manning were owed approximately $310 million. Pursuant to Georgia Code § 9-11-9.1 and/or S.C. Code §15-36-100, a declaration of merit addressing this legal malpractice claim is attached hereto as Exhibit 1.

11.     Though FIP ultimately collapsed under massive civil and criminal liability, Morris Manning kept the fees it had obtained from both FIP and Bally.

## THE PARTIES

12.     Plaintiff Beattie B. Ashmore was appointed by the United States District Court for the District of South Carolina, Greenville Division, pursuant to 18 U.S.C. § 1956(b)(4)(A) and the Court's inherent equitable powers, to serve as the Federal Receiver for the FIP Receivership Entities, which include FIP and "all businesses and/or trusts owned or controlled by Scott A. Kohn, Joseph P. Hipp, Kraig S. Aike, David N. Kenneally, Melanie Jo Schulze-Miller and their subsidiaries, successors, and assigns." Pursuant to the Receivership Order, the Receiver has been empowered to pursue legal actions for the benefit and on behalf of the FIP Receivership Entities and their respective investors or other creditors.

13.     Defendant Morris, Manning & Martin, LLP is a limited liability partnership based in Atlanta, Georgia.

## JURISDICTION AND VENUE

14.     The instant Complaint is so related to the *In re Receiver*, 6:19-cv-1112-BHH case and the underlying criminal case, *United States v. Kohn, et al.*, 6:19-cr-239-BHH that it forms part of the underlying case or controversy.

15.     The Receiver filed the Order of Appointment in the Northern, Middle and Southern Districts of Georgia, as well as the Central, Northern, Eastern and Southern Districts of California pursuant to 28 U.S.C. § 754 and venue is proper in the District of South Carolina. Service of process will be accomplished pursuant to 28 U.S.C. § 1692.

16.     Subject matter jurisdiction in this case is based upon 28 U.S.C. §§ 1331 and 1367(a).

## FACTUAL ALLEGATIONS

A.    **FIP Was a Fast-Growing Business in a Controversial But Potentially Profitable Space**

17.    Founded in April 2011 by Scott Kohn, FIP provided lump-sum cash advance payments in exchange for future pension payments, a business that relied upon avoiding the classification of those cash advance payments as loans. The legality of these transactions arguably rested on a slim reed: characterized as loans, they might violate state usury laws against excessive interest rates, but characterized as assignments or transfers, they might violate federal laws against assigning or alienating pensions.  FIP's business nonetheless  expanded quickly, even though it faced, among other risks, the possibility that its transactions could be reformed by courts to comply with state usury laws, and it quickly grew into a nationwide operation.

18.    In late 2011, a FIP competitor called Structured Investments Co., LLC ("**SICO**") suffered a series of adverse court decisions that halted SICO's purchased stream of military pension payments as violating anti-assignment and alienation statutes, due to a flaw in SICO's structure of receiving those pension payments. In December 2011, California regulators additionally halted SICO's sale of LLC membership interests to investors, who had previously been told their investments were "zero risk." SICO's business collapsed and its founders filed for personal bankruptcy in January 2012.

19.    By January 2012, FIP was contemplating an adjustment to its business model whereby instead of retaining the rights to future pension payments, FIP would connect those seeking cash advance payments ("**Sellers**") with investors who would acquire future pension payment rights ("**Purchasers**"). Under this model, FIP would act as a middleman, seemingly collecting fractional fees for its role as servicer and administrator. To guard Purchasers against the risk of disruption in pension payments, FIP contemplated establishing several protective mechanisms including life insurance policies, a captive insurance program, and a "reserve

account" that FIP would fund from its profits or a percentage of the purchase prices of the pensions it sold to compensate Purchasers in the event a Seller failed to remit payments.

**B.**    **Maxson Fails to Advise FIP of the Inherent Legal Flaws in FIP's Proposed Structure and the Resulting Risks of the Doomed Change to FIP's Business Model**

20.    It was in this context that Maxson and Morris Manning were connected to FIP in January 2012 through Ben Geber, a client of Maxson's whom Maxson would describe at his deposition as a "consultant" or "proxy" for FIP, despite the tensions and differing self-serving interests between Geber and FIP. Prior to Geber's introduction of Maxson to Kohn—and Geber's newfound interest in receiving commissions by selling pension payments to Purchasers—Maxson had represented various of Geber's entities, which had previously focused on viatical settlements. Thus, Maxson had an established and ongoing relationship with Geber and Geber's entities at the time he began to represent FIP.

21.    Despite this conflict of interest, Maxson testified that he did not perform a conflict analysis to determine whether he could ethically represent FIP and Bally simultaneously. He also testified that he did not recall whether he had received a waiver of conflicts of interest from either FIP or Bally. Upon information and belief, Maxson never asked for or obtained such a waiver from either FIP or Bally. Morris Manning also made no effort to assign separate attorneys to represent FIP and Bally; instead, Maxson personally worked for both.

22.    At the outset of this dual representation, Maxson and Morris Manning were asked to look at the structure FIP wanted to set up and identify any legal issues it might create. Both Kohn and Geber called Maxson's attention to SICO's demise as a cautionary tale of the kind of outcome they wanted to avoid with FIP, and even sent him court decisions and news articles on the subject.

7

23.     As mentioned above, Kohn was a convicted felon, and Maxson testified at his deposition that prior to Morris Manning agreeing to represent FIP, Maxson approached Morris Manning's general counsel about Kohn's criminal background. Maxson testified that although he could not "disclose what those conversations were," "[l]ong story short, we ended up representing FIP." Maxson and Morris Manning understood from the outset that Kohn's criminal background created "some additional level of risk," as Maxson explained to Geber in a March 2013 email, because "regulators tend to assume that once a crook, always a crook."

24.     Maxson and Morris Manning were also asked to provide an "opinion letter" as to whether FIP's proposed program of connecting Sellers and Purchasers would subject FIP to securities laws. Geber provided Maxson with documents and sought a price quote for Morris Manning to complete its analysis and the opinion letter. On March 6, 2012, Maxson emailed Geber:

> I looked at the docs you sent, and it confirms my initial reaction that what is required is a determination whether the investment being sold is an 'investment contract' under federal law. This sort of specific investment is not defined as a security in most, if any, states or federal law. ***What this will require is a thorough analysis of the facts surrounding the investment and an analysis to determine whether it constitutes an[] "investment contract" and thus a security under federal law.*** My gut is that based on what I know your transactions are not the sale of securities – that said it will be necessary to research the issue to determine whether there is anything out there that provides additional guidance.
>
> In round numbers, I estimate that the research required to give us comfort regarding this issue, and drafting a memo summarizing our analysis, will run in the range of $10,000-15,000. Unfortunately there are facts and circumstances and analysis and we'll need to see if there's anything out there similar to your situation. (emphasis added)

25.     Geber responded later that evening that the proposal was acceptable to FIP if Maxson felt "confident" in Morris Manning's "securities division" being able to handle the assignment. Geber indicated he had already reached out to other firms but said that he "would love

for you and [Morris Manning] to run with it if you feel good about it," asking Maxson to let him know and that "I would like to start ASAP if that is the case."

26.     Maxson quickly began expanding the scope of Morris Manning's representation of FIP. On March 27, 2012, Geber followed up with Maxson to see if Morris Manning had started the securities law memo. Maxson responded that he would make sure FIP received the analysis by early the following week. Maxson separately noted that based on his review of FIP's legal agreements, their quality "is pretty poor," and asked Geber to suggest to Kohn that the documents could use a "thorough review."

27.     When Geber asked for clarification as to what he meant, Maxson observed that FIP's "documents are amateurish, poorly organized and are insufficiently comprehensive on both the buy and sell side." Geber replied that the securities analysis was the "high priority," but asked Maxson for an estimate for the proposed work on the documents that Geber could run by Kohn.

28.     As Maxson had promised, Morris Manning delivered its securities analysis on FIP's proposed program of connecting Sellers and Purchasers in a memo dated April 2, 2012, presenting "our" conclusion that "it is unlikely" a court would deem the Purchasers' investment to be an "investment contract" that would require registration or exemption under the Securities Act of 1933.

29.     But based on Morris Manning's billing records, addressed to Kohn at FIP, it appears that instead of being prepared by Morris Manning's "securities division," Maxson was the *sole* Morris Manning attorney involved in the preparation of the memo. Far short of the $10,000-$15,000 Maxson had weeks earlier estimated would be required to perform the "thorough" research "required to give us comfort" and to draft the critical memo summarizing "our" analysis, Morris Manning's billing records indicate Maxson spent merely 6.3 hours on April 1–2, 2012,

preparing the memo, at a total cost of $3,118.50. Further, Morris Manning's billing records do not reflect *any* legal research expenses undertaken in connection with the April 2, 2012 memo delivered to both Geber and Kohn.

30.     Reflecting that perfunctory analysis, Maxson never advised FIP that by creating the Purchaser side of the business, FIP was exposing itself to the same critical flaw that had resulted in SICO's demise, namely, that an adverse determination by regulators that FIP's cash advances were disguised loans could shut down the flow of pension payments to Purchasers and deplete the reserve account, overwhelming FIP with furious investors.

31.     Maxson understood that if FIP came under intense scrutiny—which it later did— from state and federal regulators as to whether its cash advances were merely disguised loans, that scrutiny would be amplified due to Kohn's criminal background. Morris Manning's billing records reflect that the basis for not characterizing FIP's cash advances as loans was an issue Maxson researched beginning early in the representation.

32.     Stressing its importance, Maxson would later explain to a FIP employee after reviewing marketing materials on company websites: "As you know, the issue of whether these are loans or true sales is a critical issue for FIP, and if [the website] still has a message that refers to the transactions as 'pension loans' I'm seriously considering hari kari – I've got a katana somewhere."

33.     A non-negligent attorney exercising reasonable and professional care consistent with the standard of care that is expected to be exercised by a reasonably prudent attorney in providing legal services would have advised FIP not to proceed with creating the Purchaser side of the business, particularly given the client's stated objective of avoiding the mistakes that had overwhelmed SICO and destroyed that company.

34.     Maxson knew, or at least should have known, that FIP needed to bring its business into compliance with applicable laws in order to survive and that proceeding with this change to its model would pose a massive barrier to doing so.

35.     Maxson was instead more focused on winning business from a new client than identifying potentially catastrophic risks to the client's own business and advising the client accordingly.

36.     Indeed, a few weeks after Maxson delivered Morris Manning's securities law memo in April 2012, Maxson sent Kohn a Morris Manning engagement letter directed to FIP's marketing affiliate, Cash Flow Investment Partners, LLC, covering Morris Manning's general retention in connection with "needs in the life settlement industry." Significantly, this engagement letter contained no waiver of any conflicts of interest. Morris Manning's billing records reflect that FIP and its affiliates, including Cash Flow Investment Partners, LLC, were all billed under a single client number at the rates reflected in the engagement letter. Maxson would later affirm Morris Manning's representation of FIP in letters sent on Morris Manning letterhead to state and federal regulators investigating FIP's business.

**C.     FIP Fails to Disclose Risks to Purchasers in Purchase Agreements Maxson Drafted and FIP Marketing Materials Maxson Reviewed and Approved**

37.     Maxson soon took charge of drafting or re-drafting FIP's legal agreements and reviewing and editing FIP's marketing materials to advise the company on necessary changes. However, despite his substantial responsibilities, Maxson's work was often both conflicted and superficial. For example, on September 12, 2012, Geber, Bally's CEO, emailed Maxson a marketing brochure that employees of FIP (then known as PAS) used and asked Maxson to review it. Significantly, Geber told Maxson that if the review were "not too many hours, I would pick up the tab." In other words, Bally encouraged Maxson to complete work cheaply and quickly—

minimizing the chance that Maxson would detect flaws in the FIP's marketing materials that could limit Bally's ability to generate commissions. Significantly, when asked about his dual representation of FIP and Bally and his related billing practices, Maxson signaled nonchalance at his deposition, testifying: "I will just note that I billed who I was told to bill."

38.     Still, Maxson acknowledged at his deposition that he was responsible for drafting FIP's agreements, including the agreements executed by Purchasers to acquire pension payment streams ("**Purchase Agreements**"). Both FIP and Bally had direct financial stakes in the Purchase Agreements, as well as other documents related to Purchasers. Nonetheless, Morris Manning's billing practices (and related understanding of for whom Morris Manning was completing specific tasks) remained unclear. For example, in an October 23, 2012 email, Maxson sent Geber two invoices, one reflecting Maxson's own time and billed to an FIP entity and one reflecting the time of one of Maxson's colleagues and billed to Bally. Maxson noted that he understood that Bally was going to pay both invoices, explaining that "given you requested both invoices[,] I didn't think it was necessary to move the time over."

39.     In the course of drafting risk disclosures for the Purchase Agreements, Maxson realized that the bankruptcy of even one of the companies making pension payments could exhaust the reserve account. Flagging this issue, he noted in a September 2012 email to Geber: "Assuming this is correct, I think this risk needs to be made more explicit and given greater emphasis. I know all of the financial advisors out there selling the product will agree with me 100% - given that their first and only concern are moms and pops they recommend purchase the product."

40.     The Purchase Agreements ultimately included a number of risks that the Purchaser had to initial to acknowledge, including the risk that a pension obligor would go bankrupt. But the Purchase Agreements that Maxson drafted for whatever reason failed to disclose *the far greatest*

*risk to Purchasers*: the potential for adverse determinations by state and federal regulators that FIP's cash advances constitute loans, which could reduce pension payments from Sellers (*i.e.*, pensioners) in that state to Purchasers in order to comply with state usury laws, exhaust the reserve account, and overwhelm FIP's business. Further, the Purchase Agreements failed to disclose the other risk Maxson had earlier identified: that because Kohn had a criminal background involving federal financial crimes, FIP would face increased scrutiny from those state and federal regulators. In Maxson's words, "this information is something the average investor would want to know before making an investment decision."

41.    Similarly, the FIP marketing materials that Maxson was tasked with reviewing and approving failed to disclose Kohn's criminal background or the risk to Purchasers of adverse determinations by state and federal regulators. Instead, those marketing materials represented to Purchasers that FIP's structured cash flows would provide higher rates of return than traditional fixed income products and claimed that Purchasers would receive a consistent and predictable income with a rate of return of between 6.5 percent and 8 percent.

42.    Even as Maxson reviewed more contracts and marketing materials, he remained unperturbed by the relationship between FIP and Bally, or the ethical implications of Morris Manning's concurrent representation of those entities. For example, in a November 5, 2013 email to Geber, he acknowledged that employees of FIP (then known as PAS) were physically present in Bally's offices and sought their contact information: "Is there a separate phone number for the PAS folks who are in Bally's offices, or is it just the Bally general number?" Based on this knowledge of how closely Bally and FIP operated—despite their financial conflict of interest— Maxson had no reason not to discuss his conflict of interest and seek waivers of it from both FIP and Bally.

43.    A non-negligent attorney exercising reasonable and professional care consistent with the standard of care that is expected to be exercised by a reasonably prudent attorney in providing legal services also would have drafted Purchase Agreements, and advised FIP to use marketing materials, that fully disclosed to Purchasers Kohn's relevant criminal background and the risk of adverse determinations by state and federal regulators that FIP's cash advances constitute loans, which could halt pension payments to Purchasers, exhaust the reserve account, and overwhelm FIP's business.

44.    Maxson knew, or at least should have known, the massive liability FIP would face if it failed to disclose such risks to Purchasers (who in truth were investors buying an alternative investment product) in the Purchase Agreements and marketing materials.

45.    Maxson acknowledged at his deposition that he was responsible for directing FIP's response to the growing number of state and federal regulatory investigations into FIP's business, including state securities investigations into the Purchaser side of the business he had helped create. Maxson led the entire legal team's response to state enforcement actions, yet never advised FIP to strengthen its disclosures to Purchasers.

46.    For example, in a January 7, 2014 letter on Morris Manning letterhead to investigators from the federal Employee Benefits Security Administration, in response to a December 13, 2013 subpoena to FIP, Maxson stated that "[t]his firm represents" FIP, and offered a "detailed explanation" of FIP's business model "and our analysis of certain issues related thereto," purportedly in order "[t]o assist the Administration in conducting its investigation" and provide "the context necessary to clarify" FIP's response to the Subpoena.

47.    But in explaining why FIP's cash advances did not constitute loans, Maxson's letter described FIP's earlier business model, noting that: "Importantly, while the seller is required to

forward the received payments to [FIP], in the event that the pension obligor fails to pay the seller or goes into bankruptcy, the seller has no obligation to [FIP] for the payments not received from the pension obligor – that risk is borne by [FIP]."

48.     Of course, for years that risk, and all other non-payment risks, had instead been borne by the Purchasers, whose existence Maxson inexplicably failed to mention in his letter to federal investigators on Morris Manning letterhead.

49.     Maxson privately acknowledged to Geber in April 2014 that the Purchaser side of FIP's business was "potentially more fraught" than the Seller side, and claimed that it "has always made me far more nervous." But instead of advising FIP to either secure separate counsel and/or substantially increase their risk disclosures or wind down the Purchaser side of the business, Maxson proposed that FIP simply avoid sending out mailers to solicit potential investors that could draw the attention of state securities regulators who, in Maxson's view, had been far more "focused on the seller's side of the process."

50.     Maxson's role at FIP ultimately expanded to the point he was effectively serving as outside general counsel for the entire group of companies.

51.     The load of regulatory investigations became so overwhelming that Morris Manning could no longer handle it all, and Maxson enlisted other firms to help represent FIP in those investigations. Those firms would direct invoices for that work to Maxson on behalf of FIP at Morris Manning's Atlanta offices.

52.     FIP employees internally referred to Maxson as "legal," the department to whom FIP's marketing materials and other important documents should be sent for review and approval.

**D.    Maxson Belatedly Discovers His Error and Realizes That FIP Could Soon Pass a Point of No Return**

53.    It was not until October 2014, when FIP began entering into settlement negotiations with state regulators investigating FIP's business, that Maxson realized, or at least, for the first time, advised FIP of the risk that adverse determinations by those regulators could overwhelm the company. In an October 29, 2014 email to Kohn, Maxson wrote:

> This raises another question I've been meaning to ask you. Has anyone at FIP run models of the amount of cash coming in from sellers versus the outflow to purchasers, and at what point it would go negative if there were a large number of defaults and/or states start to disallow these transactions and prevent FIP from collecting cash flows? I'm sure I don't need to say this, but in an abundance of caution I will reiterate that under no circumstances can the funds coming in from new purchasers be used to cover payments to existing purchasers. If you have it, I'd be interested in seeing what the total incoming v. outgoing is on a monthly basis, the impact of seller defaults and the potential sensitivity of the model to state regulatory action preventing FIP from collecting payments.

54.    Having just been advised of this massive risk to the company (more than two and a half years into Maxson and Morris Manning's representation of FIP), Kohn responded that no such reports were available but that he would promptly begin evaluating the possibility of such a "wild fire effect."

55.    It is unclear whether Maxson ever followed up with Kohn on the statistical analysis. But Maxson knew or should have known of the risk he first identified in October 2014 from the outset of his engagement, and accordingly advised FIP that introducing the Purchaser side of its model was unjustifiably risky given the known potential for adverse determinations by state and federal regulators disrupting the flow of pension payments to Purchasers. At a minimum, Maxson should have included robust disclosures of the risk of adverse determinations by regulators in the Purchase Agreements and FIP marketing materials.

56.    Maxson finally advised Kohn and FIP in December 2014 of the need to disclose the regulatory investigations and the potential impact of adverse determinations to Purchasers. In that December 2, 2014 email to Kohn, Maxson seemed to realize the immense gravity of his error. Maxson forwarded Kohn a set of discovery requests from state regulators, then added:

> Also – the disclosures to FIP cash flow purchasers need to be updated to reflect the ongoing investigations into the seller side of the business and the impact this could have on purchasers. As we have discussed multiple time[*sic*], there has always been the potential that a securities department could attempt to characterize these investments as investment contracts, and, thus, securities. One of the strongest factors against such a determination is the robust disclosure that FIP has included in its buyers agreement. To the extent the various investigations into the sellers' side of the transaction have increased the risk that regulators will shut down the business in their state, *this needs to be disclosed to buyers as it has the potential to impact their ability to receive their return, and is a salient factor in their decision whether or not to purchase a cash flow. This should be a must for all new buyers.*
>
> Additionally, I suggest that all existing purchasers of cash flows be notified that the investigations are occurring and, perhaps, given the option to have some/all of their remaining purchase refunded (without the return, of course). Undoubtedly this would be disruptive, but it would make it far more difficult for any purchaser to claim they were damaged in the event that a regulator prohibits FIP from collecting cash flows from a state associated with any purchase, as well as make it more difficult for regulators to claim that buyers are not making an informed buy decision. (emphasis added)

57.    Kohn responded shortly thereafter, "We might as well close the doors! If I do this were[*sic*] DONE!" Maxson then replied:

> Understood. It's a risk/benefit analysis. I believe the risks of not including a disclosure about the regulatory investigations to new purchasers significantly outweighs the benefits of not including it. Undoubtedly you will lose some deals but the deals you do close will be less susceptible to challenge on that basis. As for going to existing purchasers, I understand that is a much tougher call – I just wanted to make sure you're aware that such a disclosure and offer could serve as an additional defense in the event of future claims.

58.    Following this exchange, Maxson began drafting proposed disclosures on this issue for inclusion in new Purchase Agreements. But even the changes to new Purchase Agreements would not be implemented until after Maxson departed Morris Manning, taking along with FIP's business, in January 2015. Kohn's felony conviction was never disclosed.

59.    Had the Purchase Agreements drafted by Maxson and the FIP marketing materials reviewed and approved by Maxson adequately disclosed these risks to Purchasers from the outset, FIP at least would not have faced potential company-destroying liability for securities fraud, and could have enabled FIP to bring itself into compliance with applicable laws.

60.    Instead, in a misguided effort to satisfy the expectations of the unwitting "moms and pops" who had been duped into investing in FIP's inherently flawed product, FIP under Maxson's watch passed a point of no return when it could no longer bring itself into compliance with applicable laws, while new investor money was used to make payments to old investors as though those amounts came from the reserve account that had already been depleted. The indictment of FIP and its principals alleges that they perpetrated their fraud "[a]s state regulators began prohibiting FIP from operating in various states and pensioners struggled under a usurious payment regime imposed on them."

61.    The business managed to continue running until April 2018. By that time, agencies representing at least thirteen states had made determinations that FIP's cash advances constituted loans and taken related actions including reforming agreements with Sellers to comply with usury laws. Maxson never acknowledged his errors to FIP, and Kohn's "faith and trust" in Maxson remained unshaken as Maxson continued to represent FIP until it ceased operations, by which point the Purchasers victimized by the scheme Maxson had blessed were owed approximately $310 million.

62.     On March 12, 2019, a federal grand jury indicted Kohn and FIP for conspiracy to engage in wire and mail fraud. So although he had originally retained Maxson to help him avoid the fate of SICO's founders, Kohn now resides in a federal penitentiary.

**E.     The Receiver Investigates Morris Manning's Role**

63.     Following Kohn and FIP's indictment, DOJ moved the Court, pursuant to 18 U.S.C. § 1956(b)(4)(A) and the Court's inherent equitable powers, for the appointment of a Federal Receiver regarding Kohn and FIP.

64.     The Court granted DOJ's motion on April 15, 2019, and appointed Beattie B. Ashmore as the Receiver.

65.     As part of the Receiver's investigation into FIP's affairs, Maxson was deposed on February 3, 2021, with his deposition carrying over to a second day of testimony on March 11, 2021.

66.     According to Maxson's testimony at his deposition, the last time Geber and Maxson spoke, Geber told Maxson that the FBI had contacted him to discuss FIP.

67.     The Receiver entered into a standstill and tolling agreement with Morris Manning effective April 15, 2022.

## FIRST CAUSE OF ACTION
### LEGAL MALPRACTICE/NEGLIGENCE

68.     The Receiver repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

69.     Morris Manning had an attorney-client relationship with FIP. As FIP's counsel, Morris Manning owed FIP a duty to exercise reasonable and professional care consistent with the standard of care that is expected to be exercised by a reasonably prudent attorney in providing legal services.

19

70.    Morris Manning, however, failed to exercise reasonable and professional care in providing services to FIP. To summarize, Morris Manning was retained to review FIP's structure and the proposed change to FIP's business model that would create the Purchaser side of the business. Later, Morris Manning was retained to draft FIP's legal agreements and to review FIP's marketing materials and advise on necessary changes.

71.    A non-negligent attorney exercising reasonable and professional care consistent with the standard of care that is expected to be exercised by a reasonably prudent attorney in providing legal services would have advised FIP not to proceed with creating the Purchaser side of the business.

72.    Alternatively, a non-negligent attorney exercising reasonable and professional care consistent with the standard of care that is expected to be exercised by a reasonably prudent attorney in providing legal services would, at minimum, have drafted Purchase Agreements, and advised FIP to use marketing materials, that fully disclosed to Purchasers Kohn's criminal background and the risk of adverse determinations by state and federal regulators that could halt pension payments to Purchasers, exhaust the reserve account, and overwhelm FIP's business.

73.    Maxson knew, or at least should have known, the harm to FIP's existing business that could result from failing to advise the company of the massive risks involved with proceeding with this change to its model. Similarly, Maxson knew, or at least should have known, the massive liability FIP would face if it failed to disclose such risks to Purchasers in the Purchase Agreements and marketing materials. In fact, at the end of 2014, years after he had failed to pull FIP back from the regulatory and legal point of no return—and, in fact, had blessed its wild and unlawful expansion—he explicitly stated that the regulatory risk to the new business model had never been disclosed, should be disclosed to new investors going forward, ___**and**___ should then also be disclosed

to old investors along with refunding their investments as a result of the failure to disclose originally, a failure that fell squarely on Morris Manning's shoulders.

74.    If Morris Manning would have provided that advice in the beginning, when they were asked to, then FIP would have either ditched the new business model or disclosed the regulatory risks to the Buyers. Either way, FIP would have brought itself into compliance with applicable laws. In terms of securities laws, either  there would have been no investors  or the investors would have been fully informed of the risks. Thus, if Morris Manning had proved non-negligent advice to FIP, FIP would have become a fully legal and profitable business, free from the liability created by Morris Manning's negligent advice that ultimately sank the business. As a result of Defendant's negligence, FIP suffered damages in the form of the Seller side of the business that was decimated by the liabilities created by the Purchaser side of the business that collapsed under regulatory, civil, and criminal actions and left investors owed approximately $310 million.

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

75.    The Receiver repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint as if set forth fully herein.

76.    Morris Manning owed a fiduciary duty, including a duty of loyalty, to FIP as its attorney.

77.    Morris Manning breached that fiduciary duty to FIP by simultaneously representing FIP and Bally in the same matters, specifically FIP and Bally's purported brokering of the sales of pensions, even though FIP and Bally's interests were adverse. FIP had an interest in its own, ongoing solvency and compliance with applicable laws, which it could maintain through prudent decisions based on the legal advice of competent and loyal attorneys. Bally had no interest in FIP's

ongoing solvency but rather sought to generate revenue for itself through its commissions and purported consulting fees, which were based on its purported sales of pensions, regardless of the risks those purported sales generated.

78.    Morris Manning never obtained a waiver of this conflict of interest from FIP.

79.    Morris Manning never sought to manage this conflict of interest or assign certain lawyers within its organization to represent only one or the other of FIP or Bally. In fact, Maxson actively worked for both FIP and Bally, and it was rarely clear for which entity he completed any given task.

80.    Morris Manning's breach of its fiduciary duty to FIP harmed FIP by diminishing the quality of the legal advice FIP received. As an example, Geber, Bally's CEO, emailed Maxson a marketing brochure that FIP's employees used, asked Maxson to review it, and told Maxson that if the review were "not too many hours, I would pick up the tab." In other words, Bally encouraged Morris Manning to complete work quickly and superficially—minimizing the chance that Maxson would detect flaws in the marketing materials that would limit Bally's ability to generate commissions. This harm that FIP suffered as a result of Morris Manning's conflicted legal advice contributed to FIP's collapse into receivership. Morris Manning is liable for all damages suffered by FIP proximately caused by Morris Manning's breaches of fiduciary duty.

81.    Moreover, even as FIP collapsed into receivership, Morris Manning retained its improperly and unethically generated fees received from both FIP and Bally. Accordingly, the Receiver also seeks disgorgement of all fees that Morris Manning received from its dual representation of FIP and Bally.

## JURY DEMAND

The Receiver demands a trial by jury on all counts that are so triable.

## **PRAYER FOR RELIEF**

For all of the foregoing reasons, the Receiver respectfully prays that Defendant be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in the Receiver's favor, and against Defendant for the following:

a.    actual, compensatory, consequential, exemplary, punitive, rescissionary, restitutionary, and all other damages in an amount to be proven at trial;

b.    disgorgement of fees paid to Morris Manning by FIP and Bally;

c.    pre-judgment and post-judgment interest at the highest rates allowed by law;

d.    costs of court and attorneys' fees; and

e.    All such further relief to the Receiver is entitled at law and in equity.

Dated: December 4, 2023                Respectfully submitted,

*/s/ L. Walter Tollison, III*
L. Walter Tollison, III (Fed Bar #4117)
THE TOLLISON LAW FIRM, P.A.
18-B S Markley Street
Greenville, SC  29601
Telephone: (864) 451-7038
Facsimile: (864) 451-7591
walt.tollison@thetollisonlawfirm.com

William T. Reid IV (*Pro Hac Vice*)
Craig A. Boneau (*Pro Hac Vice*)
Scott D. Saldaña (*Pro Hac Vice*)
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Highway
Ste. C300
Austin, Texas 7746
Telephone: (512) 647-6100
Facsimile: (512) 647-6129
wreid@reidcollins.com
cboneau@reidcollins.com
ssaldana@reidcollins.com

Woodworth B. Winmill (*Pro Hac Vice*)
REID COLLINS & TSAI LLP
420 Lexington Ave., Suite 2731
New York, NY 10170
wwinmill@reidcollins.com

***Attorneys for Beattie B. Ashmore as Receiver for the FIP Receivership Entities***